UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| TIMOTHY GENE HOAGLAND, | ) | |
| --- | --- | --- |
| | ) | No. 13 CV 705 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration,[1] | ) | |
| | ) | September 18, 2014 |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

Timothy Hoagland seeks disability insurance benefits ("DIB"), *see* 42 U.S.C. §§ 416(i), 423, and supplemental security income ("SSI"), *id.* §§ 1381, *et seq.*, claiming that he is disabled as a result of bipolar disorder and depression. After the Commissioner of the Social Security Administration denied his applications, Hoagland filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the foregoing reasons, Hoagland's motion is granted and the Commissioner's motion is denied:

**Procedural History**

Hoagland applied for DIB on May 25, 2009, and SSI on June 4, 2009, (Administrative Record ("A.R.") 125), claiming a disability onset date of May 19, 2009, (id. at 71). After the Commissioner denied his claims initially and upon

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

reconsideration, (id. at 55, 60, 68, 72), Hoagland sought and was granted a hearing before an administrative law judge ("ALJ"), (id. at 76, 81). A hearing was held on May 12, 2011, at which Hoagland, a medical expert, and a vocational expert provided testimony. (Id. at 27-50.) The ALJ issued a decision finding that Hoagland is not disabled within the meaning of the Social Security Act and denying his DIB and SSI claims. (Id. at 17-22.) When the Appeals Council denied Hoagland's request for review, (id. at 1-6), the ALJ's denial of benefits became the final decision of the Commissioner, *see O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). On January 29, 2013, Hoagland filed the current suit seeking judicial review of the Commissioner's decision. *See* 42 U.S.C. § 405(g); (R. 1, Compl.). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c); (R. 12).

**Facts**

Hoagland, who is 41 years old, suffers from depression, bipolar disorder, and other impairments. He held a variety of jobs, including furniture refinisher, warehouse worker, and janitor, before applying for DIB and SSI, and last worked for the Salvation Army in May 2009. Hoagland claims that his depression and bipolar disorder became disabling on May 19, 2009. He presented both documentary and testimonial evidence in support of his claim.

**A. Medical Evidence**

The relevant medical record begins in February 2009 when Hoagland sought treatment from Dr. Eva Kurilo, a psychiatrist at the Ecker Center for Mental

2

Health ("Ecker Center"), for "mood problems." (A.R. 259-61.) Dr. Kurilo observed that Hoagland did not appear sad and was smiling appropriately during his interview. (Id. at 260.) She noted that his concentration was fair, although he seemed "a little bit distractible," and that he conveyed no suicidal or homicidal ideations or overtly paranoid statements. (Id.) Dr. Kurilo diagnosed Hoagland with mood disorder along with alcohol abuse and pathological gambling based on his self-reported history. (Id.) Hoagland told Dr. Kurilo that he used to take Luvox to help with his depression, but that the medication had been less effective recently. (Id.) She instructed Hoagland to continue taking Luvox but also prescribed Lamictal as a mood stabilizer and recommended psychotherapy. (Id.)

Dr. Kurilo continued to see Hoagland about once a month between February and August 2009. (See id. at 262-69.) During those visits Hoagland appeared "pleasant" and "cooperative," exhibiting good attention and fair concentration. (Id. at 264-67.) Dr. Kurilo's progress notes indicate that he was tolerating his medication well and seemed to be improving, although she increased Hoagland's Lamictal dosage in May 2009 when he reported that the medication was not working as well as before. (Id. at 264-65, 267.)

In August 2009 Hoagland was treated by Dr. Syed Anwar, another psychiatrist at the Ecker Center. (Id. at 318.) Dr. Anwar noted that Hoagland's mood was stable and that he was tolerating his medications well with no side effects. (Id.) He continued to see Hoagland about once every three months between August 2009 and January 2011. (Id. at 318, 391-92, 395-98.) Over the course of

3

treatment Dr. Anwar observed that decreasing Hoagland's medications increased his mood swings and anxiety, and in February 2010 Dr. Anwar prescribed Trazodone to help Hoagland sleep. (See id. at 397.) Dr. Anwar's notes generally indicate that Hoagland did well with his medications during that time period, although there were instances when Hoagland's symptoms worsened significantly.

Specifically, in July 2010, Hoagland overdosed on Lamictal in an attempt to commit suicide after his mother's death and was admitted to the emergency room. (Id. at 344.) He was described as being "initially combative and agitated" and "crying a lot." (Id. at 342.) Dr. Anwar observed that Hoagland was depressed and in an "almost catatonic state." (Id. at 345.) He was treated with antipsychotic medications, (id.), and diagnosed with bipolar disorder and personality disorder, (id. at 366-67). After spending a few days in the emergency room, Hoagland was transferred to Elgin Mental Health Center ("EMHC") and admitted into the care of Dr. Kurilo. (Id. at 370.) Dr. Kurilo completed a psychiatric evaluation noting Hoagland's irritability, depression, anxiety, and anger control problems. (Id. at 368.) She diagnosed him with bipolar disorder "due to his history of impulsivity, anger, and moodiness," and that he had been "under a lot of stress over the last weeks." (Id.) His symptoms included racing thoughts and the "[i]nability to complete day-to-day chores[.]" (Id. at 368.) Dr. Kurilo noted that he was "doing fairly well on his medications" before "recent stressors, including relationship problems and financial issues." (Id. at 370.) Hoagland was eventually released in stable condition after spending almost three weeks at EMHC. (See id. at 386.) But

4

then in September 2010, police officers brought Hoagland back to the Ecker Center because his former girlfriend reported that Hoagland had expressed suicidal thoughts to her. (Id. at 393.) Although he was agitated upon arrival, Hoagland denied suicidal ideations and was released the same day after being judged not to be a risk of harm to himself or others. (Id.)

The record also includes psychiatric evaluations from state agency consultants and Dr. Anwar. In August 2009, consultant W. Nordbrock, Ph.D., completed a Psychiatric Review Technique form. (Id. at 287-300.) He concluded that Hoagland's impairment was not severe, and that he had only mild difficulties in maintaining social function and no limitations in activities of daily living and maintaining concentration, persistence, or pace. (Id. at 287, 297.) Dr. Nordbrock found Hoagland to be "partially credible" because his self-described symptoms were "somewhat more severe" than his Global Assessment Functioning ("GAF") score of 55.[2] (Id. at 299.) Dr. Nordbrock also believed that Hoagland's symptoms were inconsistent with his mother's account of his activities of daily living, which included making light meals, mowing the lawn, grooming and hygiene, taking his medications, going outside alone, driving a car, shopping for groceries, and handling his own finances. (Id.) Dr. Nordbrock concluded that Hoagland's psychiatric

---

[2] The GAF score is "a psychiatric measure of a patient's overall level of functioning." *See Jelinek v. Astrue*, 662 F.3d 805, 807 (7th Cir. 2011). The GAF scale ranges from zero to 100, with 100 describing "[s]uperior functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000) ("DSM-IV-TR"). A score between 51 and 60 reflects "[m]oderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

5

treatment had been "relatively short and infrequent" and that the medical record did not support the severity of Hoagland's complaints. (Id.)

In November 2009, Carl Hermsmeyer, Ph.D., agreed with Dr. Nordbrock's assessment, noting that Hoagland reported his condition was "fair" and that medication was helping. (Id. at 330.) Dr. Hermsmeyer concluded that Hoagland was "partially credible" and pointed out that Hoagland reported "feeling better." (Id.) Neither Dr. Nordbrock nor Dr. Hermsmeyer noted any episodes of decompensation, as both of their evaluations were completed prior to Hoagland's July 2010 suicide attempt.

In July 2011, Dr. Anwar completed an Affective Disorders Professional Source Data Sheet in which he confirmed that Hoagland has bipolar disorder. (Id. at 418-23.) He opined that Hoagland has marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, and repeated episodes of decompensation. (Id. at 420.) Dr. Anwar also concluded that for RFC purposes, Hoagland is moderately limited in his ability to carry out short and simple instructions, make simple work-related decisions, and maintain socially appropriate behavior. (Id. at 422.) He further opined that Hoagland is markedly limited in his ability to maintain attention and concentration for extended periods, work with others without being distracted by them, complete a normal workday without interruptions from his symptoms, work at a consistent pace without an unreasonable number of rest periods, and accept instructions and respond appropriately to criticism from supervisors. (Id.) Dr. Anwar indicated that

6

"even a minimal increase in mental demands or change in the environment" would cause Hoagland to decompensate. (Id.)

**B. Hoagland's Testimony**

During the hearing in May 2011, Hoagland described his past work history. He testified that he last worked for the Salvation Army in May 2009 doing "custodial and driving work" until he was terminated for getting into a fight with his supervisor. (A.R. 31, 35-36.) He explained that his termination was part of a "continuing pattern" and that he had been fired from numerous jobs over the past several years for arguing with customers or employers. (See id. at 33, 36-39.) His previous work positions included janitor, furniture refinisher, machine operator, auto mechanic, and store manager. (Id. at 36-39.)

With respect to daily activities, Hoagland testified that he can drive, clean, do laundry, and walk his dog. (Id. at 32, 34.) He said he mows the lawn but does not do his own grocery shopping. (Id. at 34.) He stays in the house by himself most of the time, (id. at 32), but goes to church on Sundays and occasionally goes to a hobby store, (id. at 40). Hoagland testified that he visits relatives once or twice every two to three months, and that he does not have any friends. (Id.)

Regarding his medical treatment, Hoagland said that he takes Luvox, Lamictal, and Trazodone. (Id. at 31.) He stated that he had been seeing Dr. Anwar for about a year and a half. (Id.) When asked whether he was getting any therapy or counseling for anger management, Hoagland responded that he was in therapy, but not specifically for anger management. (Id. at 34.)

## C. Medical Expert's Testimony

Medical Expert ("ME") Kathleen O'Brien, Ph.D., a psychologist, testified regarding Hoagland's ability to engage in employment given his bipolar disorder and depression. (A.R. 40-44.) Dr. O'Brien noted that Hoagland had an episode of decompensation in July 2010, but that his records from before and after that episode reflect "infrequent" and "inconsistent" visits to his psychiatrist. (Id. at 41.) She pointed to a lack of counseling records showing that Hoagland was being treated for anger issues, concluding that the record did not establish that Hoagland's anger "ha[s] much to do with [his] bipolar disorder." (Id.) Dr. O'Brien went on to opine that Hoagland has mild difficulties with activities of daily living, moderate difficulties with social interaction, and moderate difficulties with concentration, persistence, and pace. (Id. at 42.) When the ALJ asked how these limitations would impact Hoagland's residual functional capacity ("RFC"), Dr. O'Brien responded that Hoagland should be limited to a job with no social contact and only occasional contact with peers and supervisors. (Id.)

## D. Vocational Expert's Testimony

Vocational Expert ("VE") Lee Knutson testified regarding the kinds of jobs someone with certain hypothetical limitations could perform. (A.R. 44-49.) The VE first confirmed that Hoagland's previous jobs included machine operator, furniture refinisher, warehouse laborer, janitor, and store manager. (Id. at 46-47.) The VE testified that Hoagland had performed these jobs at the unskilled, semiskilled, and skilled levels, and at light, medium, and heavy exertion levels. (Id. at 47.) The ALJ

8

asked the VE whether Hoagland could perform any of his past work given no exertional limits, but no social contact and only occasional contact with peers and supervisors. (Id. at 48.) The VE responded that Hoagland could perform his previous work as a machine operator, furniture finisher, and janitor. (Id.) Then Hoagland's attorney asked whether Hoagland could perform any past work if he was markedly limited in his ability to work with others without being distracted by them, markedly limited in his ability to complete a normal workday or workweek without interruptions from his symptoms, markedly limited in his ability to perform at a consistent pace without "an unreasonable number" of rest periods or other distractions, and markedly limited in the ability to accept instructions and respond appropriately to criticism from supervisors. (Id. at 48-49.) The VE responded that assuming "markedly limited" meant "incapable of," Hoagland could perform past work even if he were unable to work with others without being distracted by them. But the VE testified that Hoagland would be unemployable if any of the other described limitations applied. (Id. at 49.)

E. The ALJ's Decision

The ALJ concluded that Hoagland is not disabled under §§ 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. (A.R. 22.) In applying the standard five-step sequence for assessing disability, *see Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), the ALJ determined at steps one and two of the analysis that Hoagland has not engaged in substantial gainful activity since May 19, 2009, and that his bipolar disorder and alcohol dependence constitute severe impairments. (A.R. 19.)

9

At step three, after applying the special technique for analyzing mental impairments, the ALJ found that Hoagland's impairments neither meet nor medically equal any of the listings in 20 C.F.R. 404, Subpart P, Appendix 1. (Id.) Proceeding to steps four and five of the analysis, the ALJ concluded that Hoagland has the RFC to perform a full range of work, except that he could have no contact with the public and no more than occasional contact with coworkers and supervisors. (Id. at 20.) The ALJ determined that Hoagland is able to return to his previous work as a machine operator, furniture refinisher, and janitor. (Id. at 22.) Accordingly, the ALJ concluded that Hoagland is not disabled and denied his applications for benefits.

**Analysis**

In moving for summary judgment, Hoagland argues that the ALJ committed reversible errors in determining his RFC and assessing his credibility. This court's role is limited to determining whether the ALJ's decision is supported by substantial evidence and free of legal error. *See Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and his conclusion, but not necessarily to provide a comprehensive written evaluation of every piece of evidence in the record. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). In asking whether the ALJ's decision has

adequate support, this court will not reweigh the evidence or substitute its own judgment for the ALJ's. *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## A.  Credibility Analysis

The court first addresses Hoagland's challenge to the ALJ's credibility analysis because an erroneous credibility determination is often reason enough to reverse an ALJ's decision. *See Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011). Although this court will not disturb the ALJ's credibility assessment unless it is "unreasonable or unsupported," *see Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008), Hoagland meets his burden here because the ALJ's "assessment" consists of only one sentence describing Hoagland's statements as "not fully credible" without any discernible explanation why, (see A.R. 21). When making a credibility determination, regulations require the ALJ to "consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996); *see Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) (ALJ must "articulate specific reasons for discounting a claimant's testimony as being less than credible"). The ALJ implies from his discussion of the medical evidence that he found Hoagland's statements to be inconsistent with or unsupported by the record, but the ALJ makes no reference whatsoever to Hoagland's hearing testimony. As an initial matter, a perceived lack of medical evidence supporting the severity of a claimant's symptoms is insufficient, standing alone, to discredit his testimony. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citations omitted). But even if such a basis were sufficient, for the

reasons discussed below, the court finds the ALJ's analysis of the medical evidence problematic, and the ALJ offered no other reasoning to support his adverse credibility finding.

An erroneous credibility determination mandates a remand "unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014); *see also Punzio*, 630 F.3d at 709 (noting that an inadequate credibility determination is "reason enough" to reverse an ALJ's decision). Neither of those exceptions applies here. Hoagland's testimony is not so contradicted by medical evidence as to be unbelievable, and it is unclear what role the ALJ's cursory credibility determination played in his decision. Accordingly, this case must be remanded for a new credibility determination.

**B. RFC Assessment**

Although the problems with the ALJ's credibility analysis necessarily cast doubt on the RFC assessment, *see Pierce*, 739 F.3d at 1051, in the interest of completeness the court will address Hoagland's RFC-specific arguments. Hoagland first argues that the ALJ gave insufficient weight to the opinion of his treating psychiatrist, Dr. Anwar. (R. 19, Pl.'s Mem. at 10-17.) As a "treating source," Dr. Anwar's opinion is entitled to controlling weight provided it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *See* 20 C.F.R. § 404.1527(c)(2); *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). An ALJ may

discredit a treating source's opinion if it is internally inconsistent or inconsistent with the opinion of a consulting source, provided the ALJ minimally articulates his reason for crediting or rejecting evidence of disability. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). An ALJ may still look to the opinion even after opting to afford it less evidentiary weight, but how much weight the ALJ affords depends on a number of factors such as the length, nature, and extent of the physician's and claimant's treatment relationship, whether the physician supported his opinions with sufficient explanations, and whether the physician specializes in the medical conditions at issue. *See* 20 C.F.R. § 416.927(d)(2)(i)-(ii), (d)(3), (d)(5).

Here, the ALJ did not sufficiently articulate his reasons for affording less than controlling weight to Dr. Anwar's opinion. Dr. Anwar opined that Hoagland is markedly limited in maintaining social functioning and maintaining concentration, persistence, or pace, and that he suffers from repeated episodes of decompensation. (A.R. 420.) The ALJ acknowledged Dr. Anwar's finding of marked limitations in social functioning, but noted that Dr. Anwar also reported "only moderate limitations" in Hoagland's capacity for understanding, remembering, and following simple instructions. (Id. at 21, 422.) The ALJ went on to state that Hoagland managed to perform "a wide range of activities of daily living including lawn maintenance, pet care, wood-burning crafts, model railroading, and church attendance and participation." (Id. at 21.)

First, by only highlighting Dr. Anwar's finding of "moderate limitations" in Hoagland's capacity for understanding, remembering, and following simple

13

instructions, the ALJ "cherry-picked" evidence to support a denial of benefits. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). More specifically, the ALJ neglected to address Dr. Anwar's other findings that Hoagland is markedly limited in maintaining concentration for extended periods of time, markedly limited in his ability to work with others without being distracted, and markedly limited in his ability to complete a normal workday without interruptions from his symptoms. (A.R. 422.) An ALJ cannot selectively consider medical reports, especially those of treating physicians, and only focus on evidence that is favorable to his RFC assessment. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

The ALJ's second reason for discounting Dr. Anwar's opinion also falls short. The ALJ pointed to Hoagland's ability to maintain his lawn, take care of his dog, do wood-burning crafts and model railroading, and attend church, implying that such activities are inconsistent with Dr. Anwar's findings. (A.R. 21.) But solo activities such as mowing the lawn, walking the dog, and engaging in hobbies at home do not require social interaction, and merely attending church once a week does not necessarily conflict with marked limitations in the ability to work with others. These activities also do not inherently require maintaining concentration for extended periods of time without interruption. Accordingly, it is unclear how Dr. Anwar's findings are inconsistent with Hoagland's daily activities. *See Jelinek* 662 F.3d at 812-13 (reversing partly because ALJ did not explain why he perceived daily activities inconsistent with medical evidence).

Furthermore, minimal daily activities do not establish that a person is capable of engaging in substantial physical or mental activity. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). The Seventh Circuit has repeatedly warned against citing the kind of low-level daily activities the ALJ points to here as evidence that a claimant is not disabled. *See, e.g., Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Gentle v. Barnhart*, 430 F.3d 865, 867-68 (7th Cir. 2005); *Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004).

Moreover, there is no indication that the ALJ considered the length, nature, and extent of Hoagland's treatment relationship with Dr. Anwar, the frequency of examinations, his specialty, or the types of tests he performed, as required by 20 C.F.R. § 404.1527(c)(2). The Seventh Circuit has repeatedly criticized ALJ decisions that discount the treating physician's opinion but say nothing regarding these factors. *See, e.g., Mueller v. Astrue*, 493 F. App'x 772, 776-77 (7th Cir. 2012); *Larson*, 615 F.3d at 751; *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (holding that if the treating physician's opinion is not given controlling weight, "the checklist comes into play"). Some of the factors actually support giving Dr. Anwar's opinion more weight because Dr. Anwar is a psychiatrist who treated Hoagland for at least 17 months. Also, even if the ALJ ultimately provides good reasons for rejecting Dr. Anwar's opinion, he must still determine what weight the opinion is due under the applicable regulations, which he neglected to do here. *See Larson*, 615 F.3d at

15

751. The ALJ should discuss the required factors on remand, then specify what weight he attributes to Dr. Anwar's opinion.

Hoagland next challenges other aspects of the ALJ's RFC assessment, arguing that the ALJ failed to consider evidence supporting a finding of disability. He points to the fact that his medication dosage increased steadily from May 2009 to July 2010, his symptoms during his July 2010 hospitalization were severe, and that he continued to struggle with depression and external stressors after his hospitalization. (R. 19, Pl.'s Mem. at 13-14.) But contrary to what Hoagland contends the ALJ did not overlook this evidence, he simply did not attribute the same importance to it as Hoagland does. For example, the ALJ did note that Hoagland needed medication adjustments, but the ALJ observed that during most doctor visits Hoagland reported his medications were working well. (See A.R. 21, 265, 318, 391-93, 395.) The ALJ also acknowledged Hoagland's July 2010 hospitalization as an episode of decompensation, (id. at 20-21), but did not consider Hoagland's September 2010 visit to be an episode of decompensation. The record supports the ALJ's conclusion in this respect because when Hoagland was brought to the Ecker Center in September 2010, he was released that same day after he denied having suicidal or homicidal ideations, said that his medication was working, and was judged not to be a risk of harm to himself or others. (Id. at 393.) Just because Hoagland disagrees with the ALJ's interpretation of the medical record does not mean that the ALJ's conclusions are inadequately supported.

More persuasive, however, is Hoagland's argument that the ALJ should have considered the full range of Hoagland's GAF scores. (See R. 19, Pl.'s Mem. at 14-15.) The ALJ relied on the fact that Hoagland showed "a considerable increase" in his GAF rating following his July 2010 episode in reaching his RFC determination. (A.R. 21.) But not only did that increase come on the heels of a three-week hospitalization, Hoagland's GAF score upon release was only 50, which indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)" or "serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See* DSM-IV-TR; *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010) ("A GAF rating of 50 does not represent functioning within normal limits. Nor does it support a conclusion that [claimant] was mentally capable of sustaining work."). Furthermore, the ALJ neglected to mention that Hoagland's GAF score while he was hospitalized fell between 25 and 30, (A.R. 345, 371), signifying that his behavior was "considerably influenced by delusions or hallucinations or serious impairment, in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends)." DSM-IV-TR.

As stated by the Seventh Circuit, "[t]he very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).

17

On remand, the ALJ should consider the full range of Hoagland's GAF scores and be mindful that "[a] person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days." *See Bauer*, 532 F.3d at 609; *see also Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012) (claimant's RFC should not be measured exclusively by his best days).

Hoagland's final argument regarding the ALJ's RFC assessment is that the ALJ erred in adopting the ME's opinion. (R. 19, Pl.'s Mem. at 15-19.) This court agrees. Not only did the ALJ discredit Dr. Anwar's opinion without a proper explanation, he chose to credit Dr. O'Brien—a psychologist who had never examined Hoagland—despite troubling oversights in her testimony. First, Dr. O'Brien testified at the hearing that Hoagland's anger did not "appear to have much to do with [his] bipolar disorder" and that anger is "normal in and of itself." (A.R. 41.) She went on to say that anger is an emotion "we all experience" and is "typically under the control of the person experiencing the anger in the absence of something like temporal lobe seizures, or brain damage, or something like that[.]" (Id. at 43.) She ultimately was not persuaded that Hoagland's anger is "related to a psychological condition." (Id.)

However, Dr. O'Brien seems to have overlooked a record replete with evidence that Hoagland's ongoing struggles with anger are far from "normal." In early 2009 and again in July 2010, Dr. Kurilo noted that Hoagland had "issues with anger," "problems with anger," and trouble keeping a job "because of his anger

18

issues." (Id. at 259-60, 368-371.) The latter conclusion is consistent with Hoagland's testimony that he was terminated from several jobs due to angry outbursts and arguments. (See id. at 33, 36-39.) But more importantly, Dr. Kurilo's notes explicitly state that Hoagland was diagnosed with bipolar disorder "due to his history of impulsivity, *anger*, and moodiness." (Id. at 370 (emphasis added).) It is unclear why Dr. O'Brien found insufficient evidence linking Hoagland's anger to his psychological condition despite Dr. Kurilo's findings and numerous indications that his anger issues are far from typical. *See Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) (noting that where a claimant diagnosed with bipolar disorder was found to suffer from mood swings, depression, and anger issues, among other symptoms, such findings "[we]re not 'essentially normal,' but reveal[ed] a claimant struggling with serious mental health issues").

Dr. O'Brien's testimony was also problematic in that she found Hoagland had moderate difficulties with concentration, persistence, and pace, yet did not incorporate that limitation into her RFC recommendation. (See A.R. 42.) When asked how Hoagland's limitations would impact his RFC, Dr. O'Brien only said that he should be restricted to no social contact and occasional contact with peers and supervisors. (Id.) Without explaining why, she made no mention of limiting Hoagland to jobs with simple instructions not requiring intense focus or concentration for extended periods of time, or other similar restrictions used to accommodate difficulties with concentration, persistence, or pace. *See Triplett v. Colvin*, No. 12 CV 4382, 2013 WL 6169562, at *11 (N.D. Ill. Nov. 25, 2013); *Jones v.*

19

*Astrue*, No. 11 CV 4827, 2012 WL 2018534, at *9, (N.D. Ill. June 5, 2012). The ALJ then relied on the ME's recommendation and did not incorporate any concentration, persistence, or pace limitations into the hypothetical he posed to the VE. (Id. at 22, 48); *see Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004) ("Ordinarily, a hypothetical question to the [VE] must include all limitations supported by medical evidence in the record."). On remand, the ALJ should revisit the ME's testimony and determine whether new expert testimony is necessary to accurately consider the evidence and properly incorporates all limitations supported by the record.

## Conclusion

For the foregoing reasons, Hoagland's motion for summary judgment is granted and the Commissioner's is denied. The case is remanded for further proceedings consistent with this opinion.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**